# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3463

_____

United States of America,

    Appellee,

  v.

Douglas P. Dvorak,

    Appellant.

*
*
*
* Appeal from the United States
* District Court for the
* Northern District of Iowa.
*
*
*

_____

Submitted: June 18, 2010
Filed: August 20, 2010

_____

Before WOLLMAN, EBEL,[1] and COLLOTON, Circuit Judges.

_____

EBEL, Circuit Judge.

Defendant-Appellant Douglas Dvorak was convicted of multiple counts of mail fraud, aggravated identity theft, and money laundering. The indictment alleged that Dvorak, a chiropractor, submitted false Medicaid claims in the names of children for whom he did not provide treatment. He would then deposit the Medicaid reimbursement checks he received into a checking account and, within a few days, withdraw the entire amount of the check, in cash, from the account.

---

[1] The Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

After a jury trial, Dvorak was found guilty on all thirty-nine counts in the indictment, which charged him with mail fraud, aggravated identity theft, and money laundering. On appeal, Dvorak argues 1) that the evidence presented at trial does not support his convictions for money laundering; 2) that the jury was not properly instructed as to the elements of aggravated identity theft in light of the Supreme Court's decision in Flores-Figueroa v. United States, 129 S. Ct. 1886 (2009); and 3) that the district court[2] abused its discretion when it ordered the sentences for two of his aggravated identity theft convictions to run consecutively. We affirm.

**I.**

Dvorak was a licensed chiropractor in Cedar Rapids, Iowa, who, in November 2003, became an authorized Medicaid service provider. Medicaid providers in Iowa submit their reimbursement claims either through an electronic submission to Iowa Medicaid Enterprise (IME) or by mailing a claim form to IME. The claim must include the patient's name and birth date, the patient's unique Medicaid Identification Number, the diagnosis and treatment of the patient, and the amount billed to Medicaid.

From 2005 through 2007, Dvorak obtained the names and birth dates of numerous children in the Cedar Rapids area. One of his methods for obtaining this information was to pay one of his patients to seek out Medicaid-eligible children and give the children $5 in exchange for their names and birthdays, as well as the names and birthdays of other children they knew. Dvorak

---

[2] The Honorable Linda R. Reade, Chief Judge for the Northern District of Iowa, presiding.

would then contact IME with the name and birthday information, and IME would provide him with the Medicaid Identification Numbers for those children. Armed with that information, Dvorak then created Medicaid claims for chiropractic services for the children without actually treating them—and in most cases, without actually meeting them—and submitted the claims through the mail to IME for reimbursement.[3] Two of the children in whose name Dvorak falsely filed a claim were ten-day old Medicaid-eligible babies who were, at the time, held in the Newborn Intensive Care Unit at St. Luke's Hospital in Cedar Rapids.

After submitting these claims to IME, Dvorak would receive a reimbursement check in the mail from IME. Through this mail fraud scheme, Dvorak received at least $71,375.82 from Medicaid; the district court ultimately concluded that the intended loss was $120,000.

Dvorak would take the Medicaid remittance checks to a Wells Fargo bank, which would cash the checks for him. Benita Messer, the service manager at the bank, testified that she found Dvorak's behavior odd, and she even called Medicaid to verify that the checks were authentic. Ms. Messer recommended that he open a checking account with the bank to make it easier to process the checks, and Dvorak did so. He then would deposit the Medicaid check into the account, and within a few days withdraw the entire amount of the check from his account, usually bringing his balance in the account back to zero. The amount of these deposits and subsequent withdrawals was large, ranging from $8,274.36 to $19,865.72. Ms. Messer testified that this, too, was unusual—Dvorak could have written checks against the account or withdrawn

---

[3] It appears that in one instance, Dvorak obtained a Medicaid Information Number from the parent of a child he actually treated. It was established at trial, however, that even for this child, Dvorak later submitted additional claims for treatment that was never provided.

the money from an ATM rather than withdrawing the entire amount of the check in cash.

In response to a phone call from Wells Fargo, IME began a review of claims submitted by Dvorak. Dvorak was ultimately indicted on mail fraud, identity theft, and money laundering charges. Eleven counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Counts 23-33), relate to eleven children whose identities he used in submitting false claims to IME. Each of the eleven identities corresponds to two counts of mail fraud (18 U.S.C. § 1341): one for mailing in Medicaid claims (Counts 1-11), and one for receipt of checks in payment for those claims (Counts 12-22). The six money laundering charges, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), are for the cash withdrawals of the Medicaid payments (Counts 34-39).

On April 10, 2009, a jury found Dvorak guilty on all thirty-nine counts. The court sentenced him to 37 months for the mail fraud and money laundering charges to run concurrently, and 24 months for the identity theft charges, with two of those charges to run consecutively to the 37 month mail fraud/money laundering sentence, for a total of 85 months. Dvorak filed a timely appeal.

## II.

On appeal, Dvorak raises three issues. First, he argues that the evidence does not support his conviction for money laundering because the act of withdrawing cash from his checking account demonstrates no intent to conceal the proceeds of his illegal activity. Second, he argues that the jury instructions given on the aggravated identity theft charges were flawed because they failed to include an element of the offense that the Supreme Court has since held must be proven beyond a reasonable doubt. Finally,

-4-

Dvorak contends that the district court erred in making the sentences for two of his aggravated identity theft convictions run consecutively because the court failed to consider factors set forth in the Sentencing Guidelines. We consider each argument in turn.

**A.**

Dvorak first argues that his convictions for money laundering are not supported by sufficient evidence. "This court reviews the sufficiency of the evidence supporting a conviction <u>de novo</u>, viewing the evidence most favorably to the verdict, resolving conflicts in favor of the verdict, and giving it the benefit of all reasonable inferences." <u>United States v. Spencer</u>, 592 F.3d 866, 876 (8th Cir. 2010). The "verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." <u>Id.</u> (quotations omitted).

Dvorak was convicted under the provision of the money laundering statute that makes it a crime for a defendant to conduct, or attempt to conduct, a financial transaction that involves the proceeds of a specified unlawful activity, "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).

> There are four elements to this offense: (1) defendant conducted, or attempted to conduct a financial transaction which in any way or degree affected interstate commerce or foreign commerce; (2) the financial transaction involved proceeds of illegal activity; (3) defendant knew the property represented proceeds of some form of unlawful activity; and (4) defendant conducted or attempted to

conduct the financial transaction knowing the transaction was "designed in whole or in part [ ] to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity."

United States v. Phythian, 529 F.3d 807, 813 (8th Cir. 2008) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)). The financial transactions identified in the indictment were Dvorak's "withdrawal[s] of cash from his Wells Fargo Bank account." (Indictment at 11.)

The provision of § 1956(a)(1)(B)(i) with which we are principally concerned here is whether Dvorak's withdrawals were "designed in whole or in part [] to conceal or disguise . . . the location" of the illegal proceeds. 18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added). Although cases addressing § 1956(a)(1)(B)(i) often focus upon whether the transaction was intended to conceal the "nature" or "source" of the funds, a transaction intended to conceal the location of the funds is also a violation of the money laundering statute. Concealing the location of proceeds from illegal activity is a serious offense because money that cannot be found cannot be subject to forfeiture. Indeed, Congress enacted both the money laundering and forfeiture statutes together in the same law, underscoring the common purpose served by those statutes. See Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, §§ 1352, 1366 (1986); see also 18 U.S.C. §§ 981, 982 (subjecting property involved in a money laundering offense to forfeiture). In fact, the Senate Judiciary Committee Report on the legislation identified the first two purposes of the statute as "creat[ing] a Federal offense against money laundering" and "authoriz[ing] forfeiture of the profits earned by launderers." S. Rep. No. 99-433, at 1 (1986).

On appeal, Dvorak argues that nothing about the withdrawals demonstrates that he had an intent to conceal the location of the funds. In fact, as Dvorak points out, these transactions led to the ultimate discovery of his scheme, as Wells Fargo contacted IME, which initiated an investigation into Dvorak's claims.

Dvorak relies on a number of out-of-circuit cases in which the courts held that ordinary commercial transactions, without any additional evidence of an intent to conceal, cannot support a money laundering conviction. For example, in <u>United States v. Sanders</u>, 929 F.2d 1466 (10th Cir. 1991), <u>abrogated on other grounds by</u> <u>Salinas v. United States</u>, 522 U.S. 52 (1997), the court held that purchasing cars in an ordinary, commercial transaction with the proceeds of illegal activity does not constitute money laundering. The Tenth Circuit "reject[ed] the government's argument that the money laundering statute should be interpreted to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity." <u>Id.</u> at 1472. Rather, "the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities." <u>Id.</u>

Similarly, the simple transfer of money from one bank account to another does not constitute money laundering. <u>See</u> <u>United States v. Esterman</u>, 324 F.3d 565, 570 (7th Cir. 2003) ("[W]e have stressed that the mere transfer and spending of funds is not enough to sweep conduct within the money laundering statute; instead, subsequent transactions must be specifically designed to hide the provenance of the funds involved." (internal quotations omitted)). Nor does merely writing a check to another person constitute money laundering. <u>See</u> <u>United States v. Caldwell</u>, 560 F.3d 1214, 1222 (10th

Cir. 2009) ("Money laundering requires more than simply writing a check with the proceeds of unlawful activity. We have repeatedly stated that § 1956 is not a money spending statute." (internal quotations omitted)).

Our own court has made similar observations. "[T]he money laundering statute may not be so broadly construed that it becomes a 'money spending statute.'" United States v. Shoff, 151 F.3d 889, 892 (8th Cir. 1998) (quoting United States v. Herron, 97 F.3d 234, 237 (8th Cir. 1996)). Accordingly, a defendant was found not to have committed money laundering where he purchased a cabin, in cash, with the proceeds of illicit drug activity and had the cabin put in the name of his own company. United States v. Rockelman, 49 F.3d 418, 422 (8th Cir. 1995) ("This straightforward real estate transaction and Rockelman's conspicuous connection with the property bought with the proceeds of his drug sales convinces us that the evidence here cannot support a finding that Rockelman had the necessary intent to conceal that would satisfy the money laundering statute.").

In light of these cases, Dvorak argues that affirming the jury verdict would criminalize the simple act of withdrawing cash from a checking account. We disagree, and hold that the jury could have reasonably concluded that Dvorak's withdrawals were intended, at least in part, to conceal the location of the funds. The cases cited above do not rely solely on the category of the transaction in determining whether the transaction constituted money laundering. Indeed, such a holding would contradict the plain terms of the statute, which specifically defines "transaction" to include "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition," as well as "a deposit [or] withdrawal" of funds involving a financial institution. 18 U.S.C. § 1956(c)(3). Instead, the cases cited by Dvorak held only that there were no circumstances surrounding the transaction in those particular cases from which a reasonable jury could have found an intent to conceal. See, e.g., Shoff, 151

F.3d at 892 ("That [the defendant] fraudulently spent their money . . . was not the additional crime of money laundering absent proof that the spending transactions were themselves designed to conceal some relevant aspect of his use of the fraud proceeds." (emphasis added)); Herron, 97 F.3d at 237 ("In other words, the mere fact that [defendants] used wire transfers to send money to Chicago cannot by itself satisfy the concealment element of the offense." (emphasis added)).

Accordingly, our holding today does not make it a federal offense simply to withdraw cash from a checking account. Rather, the question in this case is whether the circumstances surrounding these withdrawals can support a jury verdict that the withdrawal was designed to conceal the location of the funds. The question is one of intent, and "[i]ntent frequently cannot be proven except by circumstantial evidence." Phythian, 529 F.3d at 812 (8th Cir. 2008) (quoting United States v. Henderson, 416 F.3d 686, 692 (8th Cir. 2005)); see also United States v. Gravatt, 280 F.3d 1189, 1192 (8th Cir. 2002) (upholding conviction for money laundering where evidence at trial "provide[d] circumstantial evidence of fraudulent intent"); United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir. 1990) ("Reviewing the entire record, we conclude that the government presented sufficient circumstantial evidence from which a juror could infer each element of the money laundering offense beyond a reasonable doubt.").

Here, there was ample circumstantial evidence from which a jury could conclude that Dvorak withdrew his money with the intent of concealing the location of the funds: he withdrew the entire amount of the Medicaid checks he deposited; the withdrawals were made within one week of the deposits, usually emptying his account completely; and the cash withdrawals were large, ranging from $8,274.36 to $19,865.72. In addition, the withdrawals were in cash, which, although not dispositive, does lend greater support to the jury's

finding that the withdrawals were made with the intent to conceal the location of the funds for the simple reason that cash cannot be traced. Cf. United States v. Farese, 248 F.3d 1056, 1060 (11th Cir. 2001) (finding intent to conceal where defendant exchanged small-denomination bills for large-denomination bills "because one large-denomination bill is easier to hide than several small-denomination bills"); United States v. Barber, 80 F.3d 964, 970 (4th Cir. 1996) (recounting expert's trial testimony to the same effect). In fact, the location of the cash that Dvorak withdrew is still not known.

Thus, Dvorak's conduct was far from being the sort of ordinary commercial behavior that, by itself, courts have found insufficient to constitute money laundering, such as purchasing a car, transferring money from one bank account to another, or writing a check. Dvorak did not merely withdraw cash from his bank account, but he did so under unusual circumstances—so unusual and suspicious that they prompted a representative of Wells Fargo to contact Medicaid to verify that the checks were not fraudulent. See Esterman, 324 F.3d at 573 (stating that "unusual financial moves culminating in a transaction" can support finding an intent to conceal). This readily gives rise to the inference that he conducted the transactions with the intent to conceal the location of the funds. See United States v. Nichols, 416 F.3d 811, 822 (8th Cir. 2005) ("We have upheld money laundering convictions where there is evidence that the money transfers 'made it more difficult for the true owner of the money to trace what happened to it.'" (quoting United States v. Norman, 143 F.3d 375, 377 (8th Cir. 1998))). Therefore, based on the unique facts of this case, we conclude that a reasonable jury weighing all the circumstantial evidence surrounding Dvorak's bizarre financial transactions could find, beyond a reasonable doubt, that Dvorak acted, at least in part, with the intent to conceal the location of his fraudulently-obtained funds.

**B.**

Dvorak next argues that his aggravated identity theft convictions should be overturned because the jury instructions did not instruct the jury as to an essential element of the offense. Specifically, the jury instructions did not require the jury to conclude, beyond a reasonable doubt, that Dvorak knew that the means of identification he used belonged to another person when he committed the crime, as required by the Supreme Court in Flores-Figueroa v. United States, 129 S. Ct. 1886 (2009).

"Generally, when evaluating jury instructions, we review for abuse of discretion." United States v. Gill, 513 F.3d 836, 849 (8th Cir. 2008). "In conducting such review, this court must determine whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." United States v. Beckman, 222 F.3d 512, 520 (8th Cir. 2000) (internal quotations omitted). In addition, harmless-error analysis applies to issues of instructional error, "whether one of misdescribing an element or omitting an element altogether." United States v. Inman, 558 F.3d 742, 749 (8th Cir. 2009); see also Neder v. United States, 527 U.S. 1, 9 (1999) ("We have often applied harmless-error analysis to cases involving improper instructions on a single element of the offense."). Accordingly, an error in jury instructions "may be disregarded if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" Inman, 558 F.3d at 749 (quoting Neder, 527 U.S. at 18).

The aggravated identity theft statute provides: "Whoever . . . knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18

U.S.C. § 1028A(a)(1) (emphasis added). In Flores-Figueroa, the Supreme Court held that the use of the word "knowingly" in the statute requires the government to "show that the defendant knew that the 'means of identification' he or she unlawfully transferred, possessed, or used, in fact, belonged to 'another person.'" 129 S. Ct. at 1888. In so holding, the Supreme Court overturned this circuit's rule "that 'knowingly' only modifies 'transfers, possesses, or uses,'" and "that § 1028A(a)(1) requires only that the means of identification in fact belonged to a real person, not that the defendant knew that it did." United States v. Mendoza-Gonzalez, 520 F.3d 912, 915 (8th Cir. 2008), overruled by Flores-Figueroa, 129 S. Ct. at 1888.

Dvorak's jury trial began on April 6, 2009, and the jury returned its verdict on April 10, 2009. The Supreme Court's decision in Flores-Figueroa was not handed down until nearly a month later, on May 4, 2009. Thus, the prevailing law in the circuit at the time of Dvorak's trial was that the defendant did not need to know that the means of identification belonged to another person, see Mendoza-Gonzalez, 520 F.3d at 915, and the jury instructions given by the court did not include that additional element.

However, the district court was aware of the potential for a change in the law. In overruling the defense's objection to the jury instruction, the court stated: "[A]ccording to the Eighth Circuit, there is no fifth element to aggravated identity theft. Other circuits have disagreed, and that issue is now squarely before the United States Supreme Court. Unfortunately, we don't have an answer yet." (Transcript at 622.) Accordingly, "to make sure that we have all the information from the jury" (id.), the court submitted the following special interrogatory to the jury on the eleven aggravated identity theft counts:

In the event you unanimously found, beyond a reasonable doubt, the defendant Douglas P. Dvorak guilty of Count [], place

-12-

a check mark next to the one following space that reflects the defendant's knowledge:

We, the jury

___ unanimously find the defendant, Douglas P. Dvorak, <u>did not know</u> the personal information he used to commit the crime of aggravated identity theft as charged in Count [] was assigned to another person, specifically, a minor with the initials [], at the time he used that person's information to commit the crime of aggravated identity theft.

___ unanimously find, beyond a reasonable doubt, that the defendant, Douglas P. Dvorak, <u>did know</u> the personal information he used to commit the crime of aggravated identity theft as charged in Count [] was assigned to another person, specifically, a minor with the initials [], at the time he used that person's information to commit the crime of aggravated identity theft.

The jury found Dvorak guilty on all eleven counts, and checked the second option on all of the interrogatories, indicating that the jury found that Dvorak "did know the personal information he used to commit the crime of aggravated identity theft . . . was assigned to another person."

We conclude that the interrogatories rendered harmless any error that may have existed with the jury instructions.[4]  An error in jury instructions

_____

[4] The government conceded that the court's instructions were in error because they did not properly instruct the jury as to the knowledge component of the offense.  We accept the government's concession and assume, without deciding, that the instruction given in this case—which required the jury to

(continued...)

"may be disregarded if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" Inman, 558 F.3d at 749 (quoting Neder, 527 U.S. at 18). Here, there is no need to guess as to whether a rational jury would have found Dvorak guilty if the proper instructions were given because a rational jury did find that he met the additional element of the statute—that is, that he knew the means of identification belonged to another person. Common sense also supports this outcome. Dvorak committed the aggravated identity theft by obtaining the names and birthdays of specific children, and then calling IME to find out those specific children's Medicaid Identification Numbers. Obviously, this scheme could only work if the children actually existed; otherwise, IME would have no record of the children and could not have provided Dvorak with their Medicaid Identification Numbers. Therefore, it is clear beyond a reasonable doubt that, with the proper instructions, the jury still would have convicted him, and so any error in the jury instructions was harmless.

Dvorak argues that Neder's rule—that "a jury instruction that omits an element of the offense" is subject to harmless error review, 527 U.S. at 8—only applies if the omitted element is included in the indictment. We see nothing in Neder to support this argument. In Neder, the district court did not submit the element of materiality in a criminal tax statute to the jury for consideration, believing that the issue of materiality was for the court to decide. 527 U.S. at 6. An intervening Supreme Court decision held that materiality in the statute is a question for the jury to decide, see United States

_____

(...continued)
find that "the defendant knowingly used . . . without lawful authority . . . the means of identification, that is, the name, birth date, or Medicaid Identification Number, of another person." (Addendum to Gov't Br. at 2.)—was erroneous.

-14-

v. Gaudin, 515 U.S. 506 (1995), but the Court in Neder nevertheless affirmed because the instructional error was harmless in light of overwhelming evidence that the omitted tax information was material. Neder, 527 U.S. at 16. The Court noted that "only in a very limited class of cases" does harmless error not apply, and that an instruction that omits an element of the offense does not "necessarily render a trial fundamentally unfair" or an unreliable "vehicle for determination of guilt or innocence." Id. at 8-9 (quotations omitted). This holding did not turn on the fact that materiality was alleged in the indictment, and we see no reason why harmless error analysis should not apply to the jury instruction at issue here.

In addition, to the extent that Dvorak argues that the indictment did not adequately allege aggravated identity theft because it omitted an essential element, we disagree. The indictment alleged that "DOUGLAS P. DVORAK . . . did knowingly use without lawful authority a means of identification of another person." (Indictment at 8.) This language closely tracks that of the statute, and sufficiently charged Dvorak with the crime of aggravated identity theft. See United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008) ("An indictment is normally sufficient if its language tracks the statutory language."); see also United States v. Hernandez, 299 F.3d 984, 992 (8th Cir. 2002) ("An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted." (quotations omitted)).

The special interrogatory eliminated any possibility that the error contributed to the verdict. Accordingly, any error in not explicitly instructing the jury as to the knowledge requirement of the statute as explained in Flores-Figueroa is harmless.

## C.

Finally, Dvorak argues that the district court erred by ordering two of the eleven aggravated identity theft sentences to run consecutively to one another.[5] The court of appeals generally reviews a district court's sentence for an abuse of discretion. United States v. Lee, 545 F.3d 678, 680 (8th Cir. 2008) (Lee II). When the appellant challenges the "district court's decision to impose a consecutive or concurrent sentence," however, the court generally reviews that decision "only for reasonableness."[6] Id.; see also United States v. Lee, 502 F.3d 780, 781 (8th Cir. 2007) (Lee I) (analyzing the district court's decision to run three of defendant's § 1028A sentences consecutively for reasonableness).

The aggravated identity theft statute requires a two-year sentence for a conviction, and further requires that the aggravated identity theft sentence

---

[5] Dvorak also argues that, because the money laundering and aggravated identity theft convictions cannot stand, the sentences imposed pursuant to those Guideline ranges cannot stand. This simply reiterates his arguments from points A and B above, which we have rejected earlier, and thus no separate analysis is required here.

[6] Of course, when a statute, such as § 1028A, requires that a sentence run consecutively, the court's decision to run that sentence consecutively "is beyond the scope of reasonableness review." Lee II, 545 F.3d at 680 n.2. As explained below, § 1028A requires only that one of the § 1028A sentences run consecutively. Accordingly, Dvorak only challenges the district court's decision to run a second § 1028A sentence consecutively, which we consider under the reasonableness standard. Id.; see also Lee I, 502 F.3d at 781 (noting that, although one of the consecutive sentences under § 1028A was mandatory and thus not subject to reasonableness review, the district court's decision to run additional sentences consecutively was within the court's discretion and thus subject to reasonableness review).

must run consecutively to any other sentence imposed for other convictions. 18 U.S.C. § 1028A(a)(1), (b)(2).  However,

> a term of imprisonment imposed on a person for a violation of this section may, in the discretion of the court, run concurrently, in whole or in part, only with another term of imprisonment that is imposed by the court at the same time on that person for an additional violation of this section, provided that such discretion shall be exercised in accordance with any applicable guidelines and policy statements issued by the Sentencing Commission . . . .

Id. § 1028A(b)(4).  In other words, while a sentence imposed for aggravated identity theft must run consecutively to a sentence for any other crime, the district court has the discretion to make all the aggravated identity theft convictions run concurrently with one another.  The discretion is bounded by the statute's requirement that the court exercise its discretion "in accordance with any applicable guidelines and policy statements."  Id.; see also U.S.S.G. § 2B1.6 cmt. n. 1(B) ("See the Commentary to § 5G1.2 . . . for guidance regarding imposition of sentence on multiple counts of 18 U.S.C. § 1028A."); Lee I, 502 F.3d at 781 ("It was within the discretion of the district court . . . to run the remaining § 1028A terms concurrently after considering the factors described in application note 2(B) of U.S.S.G. § 5G1.2 . . . .").

Guideline § 5G1.2, application note 2(B) specifically addresses "multiple convictions under 18 U.S.C. § 1028A."

> In determining whether multiple counts of 18 U.S.C. 1028A should run concurrently with, or consecutively to, each other, the court should consider the following non-exhaustive list of factors:

(i) The nature and seriousness of the underlying offenses. For example, the court should consider the appropriateness of imposing consecutive, or partially consecutive, terms of imprisonment for multiple counts of 18 U.S.C. 1028A in a case in which an underlying offense for one of the 18 U.S.C. 1028A offenses is a crime of violence or an offense enumerated in 18 U.S.C. 2332b(g)(5)(B).

(ii) Whether the underlying offenses are groupable under § 3D1.2 (Groups of Closely Related Counts). Generally, multiple counts of 18 U.S.C. 1028A should run concurrently with one another in cases in which the underlying offenses are groupable under § 3D1.2.

(iii) Whether the purposes of sentencing set forth in 18 U.S.C. 3553(a)(2) are better achieved by imposing a concurrent or a consecutive sentence for multiple counts of 18 U.S.C. 1028A.

U.S.S.G. § 5G1.2, cmt. n.2(B).

Dvorak focuses his argument on subparagraph (ii) of the application note, which provides that if the underlying offenses are groupable under § 3D1.2, then the aggravated identity theft sentences should "generally" run concurrently with one another. Id. The district court made no explicit findings as to whether the conduct was groupable, but the mail fraud and money laundering counts were in fact grouped together, and Dvorak is correct that this "underlying conduct" was groupable within the meaning of § 5G1.2 note 2(B)(ii). See U.S.S.G. § 3D1.2(b) (providing that counts should be grouped together when they "involve the same victim and two or more acts or

transactions connected by a common criminal objective or constituting part of a common scheme or plan").

Although the district court did not explicitly discuss whether the counts were groupable, the court did cite the applicable guideline. The district court stated:

> I now want to turn my attention to the concurrent or consecutive sentence issue on the 1028A counts. . . . The Court has the discretion to run each of the two-year mandatory counts consecutively, which would end up with about a 22-year consecutive sentence tacked onto the 37 months that I'm going to impose. That, I believe, would be a sentence that would be too high, and I'm not going to do that. However, I am going to run two of the counts consecutively, so there will be four years on the 1028 counts running consecutively to the 37-month count sentence [sic]. I understand that I have discretion in this regard. <u>Guidance for me is contained in the advisory guidelines, United States sentencing guideline 2B1.6, comment note 1(B), and the commentary to United States sentencing guideline 5G1.2 is also referenced.</u>
>
> I find that simply running the sentences for all 1028 counts concurrently does not capture all of the harm. In essence, I would be punishing Mr. Dvorak the same as an offender who stole the identity of one victim and used it one time. Of the 11 victims that are named in the indictment by initials, defendant stole their identity and he also used their identity on multiple false claims. And if you look at all of the relevant conduct, defendant actually stole the identity of over 30 children, some multiple times, in the

commission of his scheme to defraud. And, therefore, I think that consecutive sentences are appropriate in this case, and that is my intention.

(Sentencing Transcript at 85-87 (emphasis added).)

"A court must adequately explain its decision to impose consecutive sentences" pursuant to § 1028A. Lee I, 502 F.3d at 781. In Lee I, the government conceded that the district court "did little to explain" why it ran the sentences consecutively. Id. We vacated the sentence because we were "not convinced that the district court considered the factors that must inform its decision whether to run multiple § 1028A counts concurrently or consecutively." Id. This case is readily distinguishable from Lee I. Unlike in Lee I, where the district court made no reference whatsoever to the factors in § 5G1.2, the court here clearly mentioned the applicable guideline and implicitly based her sentence on at least one of those factors by noting the seriousness of the crimes committed by Dvorak. See U.S.S.G. § 5G1.2, cmt. n.2(B)(i) (permitting the sentencing court to consider "the nature and seriousness of the underlying offenses"). While the court did not explicitly mention each factor listed in the commentary to § 5G1.2, Lee I does not require that a sentencing court must recite every factor contained in a guideline. We have squarely rejected the analogous argument that sentencing courts are required to list every single § 3553(a) factor when imposing sentence; so long as it is clear that the court considered the factors, it need not list them out. See United States v. Wood, 587 F.3d 882, 884 (8th Cir. 2009) (stating that district court is not required to recite "mechanically" all of the § 3553(a) factors when imposing sentence, and that the "court adequately addresses the factors if it references at least some of the considerations in § 3553(a)").

-20-

Here, the district court explicitly referenced the appropriate Sentencing Guidelines, and provided a reasoned basis for ordering two of the aggravated identity theft sentences to run consecutively. Although the district court could have explicitly addressed the groupability issue, it was not required to do so. See United States v. Egu, No. 09-10247, 2010 WL 1972079, at *3 (9th Cir. May 17, 2010) (unpublished) (upholding consecutive sentences for § 1028A convictions as within the district court's discretion, even though "[t]he district court could have more specifically addressed why consecutive sentences were appropriate despite the groupability of Defendant's underlying convictions"). Therefore, we conclude that the district court's decision to run the sentences consecutively was reasonable.

## III.

For the foregoing reasons, we AFFIRM Dvorak's conviction and sentence.

_____