# United States Court of Appeals

### For the Eighth Circuit

_____

No. 16-4363

_____

United States of America

*Plaintiff - Appellee*

v.

Mohamed Abdihamid Farah

*Defendant - Appellant*

_____

No. 16-4364

_____

United States of America

*Plaintiff - Appellee*

v.

Abdirahman Yasin Daud

*Defendant - Appellant*

_____

No. 16-4366

_____

United States of America

*Plaintiff - Appellee*

v.

Guled Ali Omar

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: June 14, 2018
Filed: August 10, 2018

_____

Before LOKEN, GRUENDER, and ERICKSON, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Appellants Mohamed Farah, Abdirahman Daud, and Guled Omar were convicted of several federal offenses related to their participation in a conspiracy to join the foreign terrorist organization known as the Islamic State of Iraq and the Levant ("ISIL"). They now appeal their convictions for conspiracy to commit murder abroad, *see* 18 U.S.C. § 956(a), arguing that the district court's[1] jury instructions did not require the Government to prove the requisite *mens rea* and that they were entitled to instructions on two affirmative defenses. They also challenge their sentences on both procedural and substantive grounds, and Farah claims that the district court improperly denied his motion to substitute counsel. For the reasons that follow, we affirm.

_____

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

# I.

## A.

In 2014, a group of Somali-Americans from the Twin Cities agreed to travel to Syria and join ISIL.  Federal law enforcement disrupted the plot, but not before several of the conspirators made it to the front lines.  Other members of the group eventually cooperated with the authorities.  Appellants Farah, Daud, and Omar were the only conspirators to face trial.  Because the thrust of their appeal relates to their convictions for conspiracy to commit murder abroad—and specifically to the intent element of this offense—our recitation of the facts focuses on that issue.

In March 2014, Omar, Daud, Farah, and others gathered at a local mosque. One of their friends had recently left to fight against the Assad regime in Syria, so they discussed the ongoing conflict and spent much of the evening watching pro-ISIL propaganda videos.  One of the attendees, Abdullahi Yusuf, claims that Omar recruited him that night to join a local group whose purpose was to "get to Syria and fight . . . for ISIL."

The group began meeting at least three times per week to watch *jihadi* videos and discuss the possibility of fighting in Syria.  At one such meeting in April 2014, Omar gave an "ultimatum":  leave the group or prepare for "a long and hard journey . . . to get to Syria and fight."  After this speech, the group launched into more concrete planning.  They considered a variety of logistical challenges, including how they would secure passports, raise funds, and get from Minneapolis to Syria.  They planned to fly to Turkey and arranged for ISIL handlers to facilitate transportation across the border into Syria.  Yusuf later testified that, upon arriving in Syria, the goal was to join ISIL, attend a training camp, and do whatever ISIL required.  He also recalled having specific conversations with Farah, Daud, and Omar about their desire to join the fight in Syria, and he confirmed that all three appellants understood this

meant "killing people." According to another cooperating witness, the group had forged an "agreement to go kill people for ISIL."

As the group's leader, Omar decided that the first group of conspirators would leave for Syria by June 1, 2014. Some made it to Syria and joined ISIL, while others were detained by the authorities. Sensing obstacles to departing directly from the United States, Omar and two other conspirators planned to drive from Minnesota to California, cross the border into Mexico, obtain fradulent travel documents, and make their way to Syria. They rented a car for the drive, but Omar's family intervened to prevent them from leaving.

A second round of attempts to reach Syria took place in late 2014, prompted by the group's increased awareness of government surveillance. Daud pushed everyone to leave the country on November 8, 2014. Though his own passport application had been denied, Daud used his money to help Farah travel to Syria. Farah took a Greyhound bus from Minnesota to New York but was detained while boarding a flight to Istanbul at JFK Airport. Similarly, Omar attempted to fly from Minneapolis to San Diego with his passport, but he was prevented from boarding the flight. Omar claims that he was not trying to leave the country, but he was recorded admitting that he was attempting to "get out right then and there." Both Farah and Omar were subsequently released.

In December 2014, one of the conspirators, Abdirahman Bashir, had a change of heart about ISIL after learning that several of his cousins had died fighting in Syria. He withdrew from the conspiracy and decided to cooperate with the FBI. Bashir later began recording conversations with his former co-conspirators. These recordings reveal that, despite previous setbacks, all three appellants remained committed to fighting and killing for ISIL. Omar, for example, discussed the thrill of conducting night raids with ISIL and his desire to serve as a "tank-hunter." The recorded conversations also capture the appellants' increasing animosity toward the

United States. Daud and Farah longed for an opportunity to participate in an ISIL operation on American soil, and Omar looked forward to the demise of the United States: "[The infidels] are getting it. Allah will not let America be a superpower for this long . . . . [T]heir time is coming."

In early 2015, Farah developed a contact he believed could provide fake passports for the group. After making arrangements, Daud, Farah, and Bashir drove cross-country to meet the contact in San Diego. During the drive, Daud reiterated his desire to fight for ISIL, declaring both his hatred for the United States and his longing to "shoot the lights out of" an AK-47 upon making contact with ISIL. After they arrived in California and paid for the fraudulent documents, Daud and Farah were arrested by the passport contact, who turned out to be an undercover FBI agent. Omar was also taken into custody shortly thereafter.

A grand jury later indicted Omar, Farah, and Daud for a variety of offenses related to their roles in the conspiracy. All three appellants were charged with one count of conspiracy to murder outside the United States, in violation of 18 U.S.C. § 956(a), as well as multiple counts of attempt and conspiracy to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). Additionally, Farah and Daud were charged with perjury, *see id.* § 1621; Farah was charged with making a false statement, *see id.* § 1001; and Omar was charged with attempted financial aid fraud, *see* 20 U.S.C. § 1097(a).

B.

Before trial, the Government alerted the district court to a potential conflict of interest involving a paralegal on Farah's defense team. At a hearing on the matter just over a month before trial, the attorney who employed the paralegal moved to withdraw as counsel. The court then inquired as to whether Farah's other attorney, Murad Mohammad, was capable of trying the case alone. Mohammad assured the court that he could, and Farah expressed complete confidence in Mohammad's ability

to do so.  On the basis of these assurances, the district court granted the motion to withdraw and allowed Mohammad to represent Farah alone.

This arrangement appeared to be working until Mohammad moved to withdraw four days before trial, citing a breakdown in communication and a lack of trust.  The district court conducted another hearing the morning that trial was scheduled to begin. Farah explained that he had lost confidence in Mohammad and specifically alleged that the two had not met regularly and that he did not have access to discovery materials.  But Mohammad contradicted Farah's account.  He testified about weekly meetings, in addition to several phone calls, and confirmed that Farah had been offered access to discovery materials, which Farah declined.  In light of Mohammad's explanation and Farah's abundant confidence in him only one month prior, the district court concluded that Farah had not shown "justifiable dissatisfaction" and denied the request for substitute counsel.

As trial began, the appellants raised several concerns about the district court's proposed jury instructions on the conspiracy-to-commit-murder counts, arguing that it is impossible to conspire to commit murder without a specific intent to kill.  The district court overruled this objection.  The appellants also objected to the denial of their requested affirmative-defense instructions on combatant immunity and defense of others, which the court overruled due to the lack of an evidentiary foundation.

After a three-week trial, the jury returned a verdict convicting the appellants on all counts except the perjury charge against Daud.  The presentence investigation report ("PSR") for each of the appellants calculated an offense level of 43, a criminal history category of VI, and a resulting sentencing range of life imprisonment.  After considering the factors set out in 18 U.S.C. § 3553(a), the district court varied downward for each of the appellants, sentencing Farah and Daud to 360 months' imprisonment and Omar to 420 months' imprisonment.

Farah, Daud, and Omar now appeal on several grounds. Farah argues that the district court improperly denied his request to appoint substitute counsel. All three appellants challenge their conspiracy-to-commit-murder convictions, claiming that the district court erred in its jury instructions by improperly defining murder and by refusing to instruct on two affirmative defenses. Lastly, the appellants challenge their below-guidelines sentences.

## II.

We first address Farah's argument that the district court abused its discretion by denying Mohammad's motion to withdraw and by refusing to appoint substitute counsel. "A motion for appointment of substitute counsel is committed to the district court's sound discretion." *United States v. Delacruz*, 865 F.3d 1000, 1008 (8th Cir. 2017). To prevail, a defendant must show "justifiable dissatisfaction" with his attorney, which "can arise from irreconcilable conflict, a complete breakdown in communication, or any other factor interfering significantly with an attorney's ability to provide zealous representation." *United States v. Taylor*, 652 F.3d 905, 908 (8th Cir. 2011). "Given the importance of the attorney-client relationship, the court must conduct an adequate inquiry into the nature and extent of an alleged breakdown in attorney-client communications." *Id.* (internal quotation marks omitted).

The record demonstrates that the district court conducted a sufficient inquiry into Farah's concerns about Mohammad. *See United States v. Jones*, 662 F.3d 1018, 1026 (8th Cir. 2011). Indeed, the court rejected his request for substitute counsel with the benefit of not one but two hearings. In the hearing on Mohammad's motion to withdraw, the court specifically inquired into Farah's claims of insufficient communication and lack of access to discovery. Moreover, at the hearing just one month earlier, Farah repeatedly expressed confidence in Mohammad. The court admonished Farah at that time to give prompt notice if he was dissatisfied with Mohammad, and Farah concedes that it was his own fault for failing to do so. Thus,

the district court acted well within its discretion in refusing Farah's request for substitute counsel, particularly on the eve of trial. *See id.* at 1024 ("Last-minute requests to substitute counsel remain disfavored, and a trial court's discretion is at its zenith when the defendant endeavors to replace counsel shortly before trial." (internal quotation marks, citations, and alterations omitted)).

## III.

We next turn to the appellants' claim that the district court improperly instructed the jury as to conspiracy to commit murder. We review a district court's formulation of jury instructions for an abuse of discretion and its interpretation of law *de novo*. *United States v. Cornelison*, 717 F.3d 623, 626 (8th Cir. 2013). An instructional error does not warrant reversal of a conviction if it is harmless. *United States v. Dvorak*, 617 F.3d 1017, 1024 (8th Cir. 2010). "An error in jury instructions may be disregarded if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* at 1025 (internal quotation marks omitted).

The appellants first argue that the district court erred in defining the murder element of the conspiracy-to-commit-murder offense. As provided in 18 U.S.C. § 956(a)(1), this offense encompasses a conspiracy to commit "an act that would constitute the offense of murder . . . if committed in the . . . jurisdiction of the United States." Under federal law, murder is "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). In defining this term for the jury, the district court relied on language from a relevant Eighth Circuit model jury instruction, which states that "'malice aforethought' means [1] an intent, at the time of a killing, willfully to take the life of a human being, or [2] an intent willfully to act in callous and wanton disregard of the consequences to human life." Model Crim. Jury Instr. 8th Cir. 6.18.1111A-1 (2014); *see also United States v. Johnson*, 879 F.2d 331, 334 (8th Cir. 1989) (approving a similar instruction). Nevertheless, the appellants claim

that the Government should have been required to prove a specific intent to kill and thus argue that the district court erred in including the second portion of the definition.

Even assuming they are correct that "an intent *willfully* to act in callous and wanton disregard" falls short of the requisite *mens rea* for this offense, we are convinced that this error was harmless beyond a reasonable doubt, as "a rational jury would have found the defendant[s] guilty" under an instruction requiring a specific intent to kill. *See Dvorak*, 617 F.3d at 1025. Indeed, there is overwhelming evidence in the record showing that Farah, Daud, and Omar each knew the object of the conspiracy included intentionally taking lives. Yusuf offered compelling testimony that all three appellants understood that they would engage in killing if they reached Syria. And Bashir's recorded conversations capture their intentions in vivid detail. Moreover, even were we to believe appellants' claim that they themselves had no desire to kill, all three agreed to join and support a plot aimed at sending young men to Syria to fight for a known terrorist organization. They knew that some co-conspirators actually reached Syria and were killed on the front lines, and they continued until their arrest to aid and encourage others in reaching the battlefield. On this record, it is clear beyond a reasonable doubt that the jury would have convicted them of the conspiracy even if the district court had adopted an instruction that required the Government to prove a specific intent to kill. Thus, we find that any error in the instruction was harmless beyond a reasonable doubt.[2]

Additionally, Farah and Daud argue that the district court erred in refusing to instruct the jury on the affirmative defenses of combatant immunity and defense of others. "To be entitled to a jury instruction on a justification defense, a defendant

---

[2]Given that we resolve the appellants' challenge on this basis, we need not address their related claims that the instruction's definition of murder violated their due process rights or that the instruction made the conspiracy-to-commit-murder offense duplicative of material support for terrorism.

must show an underlying evidentiary foundation as to each element of the defense, such that a reasonable person could conclude that the evidence supported the defendant's position." *United States v. Poe*, 442 F.3d 1101, 1104 (8th Cir. 2006) (internal quotation marks omitted). "Whether there is sufficient evidence to support the submission of an instruction on an affirmative defense is a question of law which we review de novo." *Id.* at 1103. In this case, the district court did not err in concluding that there was insufficient evidence to merit either instruction.

Turning first to defense of others, Farah and Daud argue that they were entitled to an instruction on this defense because there was evidence showing that "the objective of the conspiracy was to defend others from imminent bodily harm and death." Specifically, they suggest that the conspiracy to go to Syria and fight for ISIL was motivated by a desire to prevent the atrocities that the regime of Bashar al-Assad was committing against innocent Muslim civilians in Syria. But we have emphasized that the defense of another must stem from "*immediate danger* of unlawful bodily harm." *United States v. Oakie*, 709 F.2d 506, 506-07 (8th Cir. 1983) (per curiam) (emphasis added); *see also* Model Crim. Jury Instr. 8th Cir. 9.04. Even assuming that Farah and Daud sought to join ISIL out of a desire to protect innocent civilians, they never discussed killing in the context of defending individual Syrian civilians who faced an immediate and specific threat. Indeed, their purported justification pertained only, in the most general terms, to the Syrian civil war and civilian suffering. Thus, they failed a show a sufficient evidentiary foundation to warrant this instruction.

As for combatant immunity, Farah and Daud contend that their proposed "instruction was not advanced as an affirmative defense, but in order to clarify the government's burden to prove beyond a reasonable doubt that defendants entered into an agreement to kill with malice aforethought." Although their argument is not entirely clear, we understand Farah and Daud to suggest that, given their belief that they would be fighting as lawful combatants once they joined ISIL, they could not have knowingly agreed to engage in "unlawful" killings. Even under this charitable

reading, their argument fails. While Farah and Daud are correct that a defendant must generally know the facts that make his conduct illegal, *see, e.g.*, *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015), the lawfulness of a soldier's belligerency is a legal determination, *see Ex Parte Quirin*, 314 U.S. 1, 30-31 (1942), and a mistake of law is no defense, *see Elonis*, 135 S. Ct. at 2009 ("This is not to say that a defendant must know that his conduct is illegal before he may be found guilty. The familiar maxim 'ignorance of the law is no excuse' typically holds true."). Thus, there was basis for providing this instruction.

**IV.**

The appellants also claim that the district court committed procedural and substantive error in imposing their sentences. In reviewing a challenged sentence, we "first ensure that the district court committed no significant procedural error, such as . . . failing to consider the § 3553(a) factors . . . or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). "Assuming that the district court's sentencing decision is procedurally sound, [we] then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Id.*

The appellants first argue that the district court procedurally erred by failing to consider the need to avoid disparities between their sentences and those of their co-conspirators who entered guilty pleas. Under § 3553(a)(6), a district court is required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Although the district court did not expressly address sentencing disparities with the appellants' co-conspirators, each of the appellants thoroughly discussed this issue in their sentencing memoranda. We may therefore presume that the district court considered this argument. *See United States v. Johnson*, 619 F.3d 910, 922 (8th Cir. 2010). In

addition, the court thoroughly analyzed each of the other § 3553(a) factors in its statement of reasons for each appellant. Thus, we find no procedural error.

Finally, the appellants contend that their sentences are substantively unreasonable. Where, as here, a district court varies below a properly calculated guidelines sentence, "it is nearly inconceivable that the court abused its discretion in not varying downward still further." *United States v. Mohamed*, 757 F.3d 757, 761 (8th Cir. 2014). In attacking the reasonableness of their sentences, Farah, Daud, and Omar again emphasize the sentencing disparities with their co-conspirators. But as we recently explained, "[t]he statutory direction to avoid unwarranted disparities among defendants [in § 3553(a)(6)] refers to national disparities, not differences among co-conspirators." *United States v. Pierre*, 870 F.3d 845, 850 (8th Cir. 2017). In any event, the appellants were not similarly situated to their co-conspirators, who cooperated with the Government and pleaded guilty to lesser charges. *See Mohamed*, 757 F.3d at 762 (explaining that defendants are not similarly situated for the purposes of § 3553(a)(6) where one defendant accepts responsibility but the others do not). "[I]t is not an abuse of discretion for a district court to impose a sentence that results in a disparity between co-defendants when there are legitimate distinctions between the co-defendants." *Id.* at 762 (internal quotation marks omitted). After careful consideration, the district court chose to vary downward from the recommended sentence of life imprisonment and adequately explained why it granted a lesser variance to Omar than to Farah and Daud. Thus, we see no basis for finding these sentences unreasonable and conclude that the district court did not abuse its discretion.

## V.

Accordingly, we affirm the denial of Farah's motion to substitute counsel, appellants' convictions for conspiracy to commit murder abroad, and their resulting sentences.

———————————————